UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHIMOS GOGOS,

    Plaintiff,

v.

AMS MECHANICAL SYSTEMS, INC.,

    Defendant.

No. 13 CV 3779

Judge Manish S. Shah

# ORDER

Defendant AMS Mechanical Systems' motion for summary judgment [89] is granted. Enter judgment in favor of defendant and terminate civil case.

# STATEMENT

On December 26, 2012, plaintiff Anthimos Gogos began working as a welder for defendant AMS Mechanical Systems. He was terminated a little more than a month later. In this suit, plaintiff claims defendant fired him because he suffers from hypertension, and that this conduct violated the Americans with Disabilities Act. Defendant denies these claims and moves for summary judgment.[1]

The ADA prohibits a covered entity like defendant from "discriminat[ing] against a qualified individual on the basis of a disability in regard to . . . discharge of employees . . . ." 42 U.S.C. § 12112(a). Under this broad rule, an employer may neither fire an employee because he is disabled nor fail to reasonably accommodate his known physical limitations. *Id*. §§ 12112(a), (b)(5)(A). An employer cannot be said to have discriminated against a disabled employee, however, unless it actually knew (or believed) he was disabled. *Hedberg v. Indiana Bell Tele. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995).

---

[1] Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Defendant says it should be granted summary judgment because plaintiff failed to show a genuine dispute about whether defendant's general foreman, Donald Henson, knew plaintiff had hypertension when he fired him. Plaintiff says defendant undeniably knew about his hypertension because "various supervisors were aware that [plaintiff] had a medical condition that required visits to see a doctor[.]" [92] at 14. Specifically, plaintiff points to the testimony of Tom Dubsky—defendant's superintendent and Henson's boss—that the only time Dubsky heard of plaintiff was when Henson told him plaintiff "was leaving work periodically at different times during the day to go to the doctor." [91-8] at 37:2–9.

In the couple of weeks before his termination, plaintiff left work early on two occasions—once to visit the Indiana unemployment office and once because he came down with a cold (which kept him home the next day as well). [93] ¶ 40. Plaintiff does not claim either of these early departures was related to his hypertension. Henson was informed of each incident, but he did not ask—or otherwise learn—why plaintiff had to leave. *Id*. ¶¶ 43–44.

The morning of January 30, 2013, plaintiff decided he needed to see a doctor for his "spiked" blood pressure. It is undisputed that this was the first time plaintiff's hypertension would cause him to miss work. On the drive in, plaintiff called a phone number in the hopes of speaking with "Terry the timekeeper." [91-1] at 312:4–14. Terry was not in, so plaintiff asked an unidentified employee of defendant if he could visit the clinic at the worksite as soon as he arrived "to check my blood pressure because lately my blood pressure's high." *Id*. The man responded, "Do whatever is best for you." *Id*. at 312:17–18. When plaintiff arrived at work, he wrote a note to his acting foreman: "Christine, as you know, my blood pressure is high. I lose vision. My eye's red. I need my day off so I can go see a doctor or go to the hospital." [91-1] at 260:10–18; 266:2–5.[2] Christine told plaintiff he could leave. [93] ¶ 48. She then told Henson plaintiff was leaving. *Id*. ¶ 50. For the first time, Henson asked why plaintiff was leaving early. *Id*. Christine explained that he was going to see a doctor; though she did not explain why he was going or what his symptoms were. [91-10] at 64:7–14. Henson said he'd "take care of it." [93] ¶ 50.

According to plaintiff's deposition testimony, plaintiff encountered Henson on his way out and told him he had to go to the hospital. [91-1] 279:4–9. Before plaintiff could explain why he had to go, Henson said plaintiff was taking too much time off from work and asked if plaintiff would bring in a doctor's note the following day. *Id*. at 279:17–280:14. Plaintiff did not answer Henson's question directly; instead, he responded he was not even sure he could make it safely to the hospital. *Id*. at 285:3–

---

[2] Although plaintiff wrote "as you know" in his note, he clarified in his deposition that this was the first Christine would have heard of his blood pressure issues. *Id*. at 270:7–11.

11. The conversation between plaintiff and Henson escalated at this point, with Henson eventually terminating plaintiff on the spot. *Id*. at 285:17–286:3.

The evidence in the record does not support plaintiff's contention that various supervisors were aware Gogos had a disability. The only supervisor who knew the specifics of plaintiff's hypertension was Christine, and there is no indication that she transmitted the information to Henson or that she had a part in the decision to terminate plaintiff. Although plaintiff told the employee on the phone about his high blood pressure, there is no evidence of who that person was or whether he relayed any information about plaintiff's condition to anyone. While Henson knew plaintiff was on his way to see a doctor—and he apparently told Dubsky plaintiff had visited a doctor—no evidence suggests Henson knew the visit was for treatment of a protected disability. An employer's knowledge that an employee has paid some recent visits to the doctor, without more, is insufficient to put the employer on notice that the employee is disabled under the ADA. *See Cordoba v. Dillard's*, 419 F.3d 1169, 1180 (11th Cir. 2005) (employer's knowledge that employee's unexcused absences and tardiness were due to doctor's appointments for unknown condition failed to create genuine issue as to employer's knowledge of employee's disability).

Plaintiff cites some decisions for the proposition that minimal information about doctors' visits is enough to put an employer on notice and trigger its obligations under the ADA, but the cases do not actually support that point. *Hillis v. Larson Engineering, Inc.*, 2011 WL 2633852 (N.D. Ill. July 5, 2011) (plaintiff declared under oath that she had specific conversations with her supervisors about her carpal tunnel syndrome); *Suvada v. Gordon Flesch Co.*, 2013 WL 5166213 (N.D. Ill. Sept. 13, 2013) (employee triggered interactive process by telling employer she had cancer and asking if there were easier jobs available); *E.E.O.C. v. Sears, Roebuck, & Co.*, 417 F.3d 789 (7th Cir. 2005) (employee gave employer notes from two doctors indicating she suffered from neuropathy and recommending that she be permitted to avoid walking long distances); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996) (employee went on a series of disability leaves prior to termination and employee's doctor wrote letter to employer saying employee needed less stressful assignment). In these cases, doctor's visits combined with specific information provided by either the employee or the doctor to supervisors about the employee's medical condition provided adequate notice. Such specificity is missing here, however.

Plaintiff says defendant cannot avoid liability by "intentionally remaining in the dark regarding the reasons for [plaintiff's] doctor appointments," and that "an employer cannot expect an employee to specifically state that he has a disability and wants a reasonable accommodation." [92] at 15. True enough, but there is no evidence that Henson intentionally remained in the dark about plaintiff's condition.

3

The record shows that plaintiff and Henson's conversation got out of hand before the latter had the opportunity to learn plaintiff was disabled.

Plaintiff argues that even if Henson knew nothing of plaintiff's disability, allowing that fact to preclude liability would serve as an "end-run" around the ADA by "allow[ing] employers to isolate termination proceedings to people ignorant of employee's disabilities," thereby "immuniz[ing] themselves from the strictures of employment discrimination statutes." [92] at 15. Not so. If a bigoted manager attempts to terminate an employee by sending an ignorant manager to do the dirty work, the employer can still be held liable under a "cat's paw" theory. *See Miller v. Polaris Laboratories, LLC*, 797 F.3d 486, 490 (7th Cir. 2015).

Plaintiff has not come forward with any evidence that would permit a jury to conclude (and not just speculate) that the decision maker, Henson, knew or believed plaintiff was a person with a disability, and that disability was the basis for his termination decision. For this reason, summary judgment is granted, and I do not reach the arguments concerning whether plaintiff was substantially limited in major life activities or was meeting the employer's legitimate job expectations.

ENTER:

Date: 10/21/15

Manish S. Shah
U.S. District Judge